UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

LEVEL 3 COMMUNICATIONS, LLC,

Plaintiff,

v.

PUBLIC UTILITY COMMISSION OF OREGON; and RAY BAUM, SUSAN ACKERMAN and JOHN SAVAGE, in their Official Capacities as Commissioners of the Public Utility Commission of Oregon and not as Individuals, and QWEST CORPORATION,

Defendants.

Case No.: 3:10-CV-1030-AC

FINDINGS AND RECOMMENDATION

ACOSTA, Magistrate Judge:

*Introduction*

Plaintiff Level 3 Communications, LLC, ("Level 3") filed this action for review of an order issued by defendant Public Utility Commission of Oregon ("Commission")[1] on March 14, 2007,

[1]Also named as defendants in their official capacities as Commissioners of Oregon's Public Utility Commission are Ray Baum, Susan Ackerman, and John Savage ("Commissioners").

("Order") establishing the terms of an interconnection agreement between Level 3 and defendant Qwest Corporation ("Qwest"). Level 3 argues that the Commission erred in finding that Level 3 is not entitled to reciprocal compensation for traffic to Level 3's internet service providers ("ISP" or "ISPs") and that Level 3 must pay Qwest to carry Qwest-originated traffic from Level 3's secondary points of interconnection to its primary points of interconnection. The pivotal question before the court is whether virtual local ISP-bound traffic is subject to the reciprocal compensation requirements of § 251(b)(5) of the Telecommunications Act of 1996, Pub. L. 104-104, 110 Stat 56 (codified as amended in scattered sections of 47 U.S.C.)(the "Act"). The court finds that it is not and recommends that the Commission's ruling be affirmed.

*Background*

Qwest provides local and long distance telephone services in a number of states, including Oregon, and qualifies as an incumbent local exchange carrier ("ILEC") in Oregon under the terms of the Act. (Compl. ¶ 14.) Level 3 provides a variety of telecommunications services, including wholesale dial-up services to a number of ISPs located throughout North America. (Compl. ¶¶ 2, 13.) Level 3 is considered a competitive local exchange carrier ("CLEC") under the terms of the Act. (Compl. ¶ 2 fn 3.) Both Qwest and Level 3 have certificates issued by the Commission allowing them to provide local, long distance, and other services within the state of Oregon. (Compl. ¶¶ 13, 14.)

Telephone numbers generally consist of ten-digit numbers identified in the industry as NPA-NXX-XXXX. The first three digits – NPA – are the Numbering Plan Area, commonly known as the area code. The next three digits represent the exchange code. The area code and the exchange code together generally relate to a defined geographical area served by a local exchange carrier

("LEC") and are assigned to a rate center.[2] Telephone calls are rated as local or toll based on the rate center locations of the calling and called parties. When the area code and exchange code of both parties to a call are assigned to the same rate center, or local calling area, the call is considered local and the calling party does not incur additional charges for the call. However, any call involving different rate centers, or local calling areas, qualifies as a toll call which generally results in additional charges to the calling party. (Compl. Ex. A at 13, quoting *Verizon California, Inc. v. Peevey*, 462 F.3d 1142, 1148 (9th Cir. 2006).)

Recognizing that the imposition of toll charges on a customer connecting with ISP providers, who are generally located outside of the customer's rate center, would greatly increase the cost associated with the use of dial-up ISPs, CLECs servicing ISP-bound traffic, including Level 3, request phone numbers from a variety of calling areas and assign local numbers to their distant, or foreign, ISPs, thereby allowing the ISP customers to call the ISP without incurring toll charges. This practice is referred to as virtual local calling or virtual NXX ("VNXX"). (Compl. Ex. A at 14-15.) The communications at issue in this action are VNXX-routed ISP-bound traffic from Qwest's customers to Level 3's ISPs.

Historically, local telephone service was provided primarily by a single company within each local area holding an exclusive franchise to service a specified territory. Congress enacted the Act in an effort to disperse the existing telephone monopolies and encourage a competitive environment, thus obligating ILECs to interconnect with CLEC to provide service in a local area. 47 U.S.C. 251. If a CLEC makes an interconnection request to an ILEC, the two local carriers have a duty to negotiate the terms of an interconnection agreement that sets forth the specifics of the

---

[2]The last four digits identify a specific line assigned to a customer of the LEC.

interconnection, unbundled network elements, and services for resale to be covered by the agreements, as well as appropriate compensation for such services. *Id.*

The Act sets out a procedural framework for these negotiations. The CLEC first must make a request for interconnection with the ILEC, which may negotiate and enter into a binding interconnection agreement with the CLEC without regard to the provisions of 47 U.S.C. § 251. 47 U.S.C. §§ 251, 252(a)(1)(2007). The parties to the negotiation may, if they wish, ask a state public utilities commission "to mediate any difference arising in the course of the negotiation." 47 U.S.C. § 252(a)(2)(2007). If the parties cannot reach agreement through voluntary negotiations or mediation, either party may "petition a State commission to arbitrate any open issues." 47 U.S.C. 252(b)(1)(2007). In resolving the open issues through compulsory arbitration, a state commission must ensure that its resolution "meet[s] the requirement of section 251", and it may "impos[e] appropriate conditions" to ensure the requirements of 47 U.S.C. § 251 are met. 47 U.S.C. §§ 252(b)(4)C), (c)(1)(2007). Once an interconnection agreement has been adopted, either by negotiation or after compulsory arbitration, it must "be submitted for approval" to the state commission, which must either approve or reject the agreement. 47 U.S.C. § 252(e)(2007).

Level 3 and Qwest attempted, but were unable, to come to terms on an interconnection agreement for services in the state of Oregon. On June 3, 2005, Level 3 filed a petition with the Commission requesting arbitration of an interconnection agreement with Qwest pursuant to the Act. (Compl. ¶ 6.) After extensive briefing, multiple prehearing conferences, and an evidentiary hearing, Samuel J. Petrillo (the "Arbitrator") issued his decision on February 13, 2007 (the "Decision")(Compl. ¶ 6.) In the Decision, the Arbitrator identified three main issues of dispute, one of which was the proper regulatory treatment for VNXX calls from Qwest's customers to Level 3's

ISPs.[3] (Compl. Ex. 1 App. A at 6.) Level 3 argued that all ISP-bound traffic is subject to 47 U.S.C. § 251(b)(5), that § 251(b)(5) allows Level 3 to establish a single point of interconnection ("POI") within each rate center or local calling area in Oregon, and that § 251(b)(5) obligates Qwest to bear the cost of delivering calls from Qwest's customers to Level 3 through the singe POI, as well as compensate Level 3 for delivery of the ISP-bound traffic to Level 3's customers. (Compl. ¶ 3.)

The Arbitrator explained that the use of VNXX, which allows a CLEC to avoid toll charges, has created a regulatory dilemma, particularly true in the case of Level 3, which assigns the VNXX numbers to ISP customers and then seeks compensation from the ILEC for the servicing of the call from its POI to the ISP. (Compl. Ex. 1 App. A at 14-15.) The lack of toll charges, plus the one-way traffic streams generated by calls to ISPs, transfers the entire cost of transporting VNXX ISP-bound traffic to the ILEC. (Compl. Ex. 1 App. A at 15.)

He then recognized that Oregon, through the Commission, has banned VNXX arrangements within the state and rejected Level 3's argument that the state lacked the authority to prohibit such arrangements, explaining that the authority of state commissions to define local calling areas, and govern compensation for traffic within these areas, is well established. (Compl. Ex. 1 App. A at 16-17.) Historically, Oregon rates calls based on the physical, or geographical, location of the parties to a call. (Compl. Ex. 1 App. A at 16.) Therefore, the Commission considers VNXX calls to be "interexchange" rather than "local" in nature, as the party receiving the call is not physically located in the same calling area as the party placing the call, despite the fact that the numbers assigned to the parties are within the same calling area, a finding consistent with the Ninth Circuit's ruling in

---

[3]The other two issues are not relevant to Level 3's appeal of the Decision and are not addressed in this Findings and Recommendation.

*Verizon California, Inc. v. Peevey*, 462 F.3d 1142, 1157 n.4 (9th Cir. 2006)(*Peevey*), which explained that "[l]ocal traffic stays within the boundaries of a local calling area" while "interexchange (or 'non-local') traffic crosses the boundaries of a local calling area and is generally subject to toll or long-distance charges paid by the calling party." (quoting *Global NAPs, Inc. v. Verizon New England, Inc.*, 444 F.3d 59, 62-63 (1st Cir. 2006)(*Global NAPs I*). (Compl. Ex. 1 App. A at 16.) The Arbitrator also rejected Level 3's arguments that the Commission's definition of VNXX is not appropriate for ISP-bound traffic, and that call rating should be based on the POI locations rather than the ISPs physical location outside the State of Oregon, again relying on *Peevey*, as well as cases from the First and Second Circuit, which establish that VNXX arrangements should be determined by focusing on the geographic location of the parties to the call. (Compl. Ex. 1 App. A at 18-19.)

The Arbitrator recommended that the Commission: 1) lift the ban on VNXX arrangements to allow Level 3 to assign VNXX numbers to its ISP customers to facilitate dial-up ISP-bound traffic; 2) require Level 3 to assume responsibility for all costs associated with transporting VNXX-routed ISP-bound traffic from both its primary and secondary POIs in Oregon to its media gateway based on Qwest's tariff rates; 3) reject Level 3's request for compensation from Qwest in the amount of .0007 per minute of use for dial-up ISP bound traffic; and 4) set a rate of zero cents per minute of use for dial-up ISP bound traffic subject to true-up based on the rate set by the Federal Communications Commission (the "FCC") for VNXX-routed ISP-bound traffic. (Compl. Ex. 1 App. A at 27-30.) The Arbitrator recommended that if the FCC fails to set a rate for VNXX-routed ISP-bound traffic, the parties should petition the FCC for resolution of the matter. (Compl. Ex. 1 App. A at 30.)

On April 14, 2007, the Commission issued the Order in which it accepted all of the

Arbitrator's recommendations with regard to VNXX-routed ISP-bound traffic, with one exception. (Compl. Ex. 1.) The Commission found that it did not have authority to set any rate, even a zero rate, on the VNXX-routed ISP-bound traffic because the traffic crossed state boundaries, was interstate in nature, and therefore was subject to FCC jurisdiction. (Compl. Ex. 1 at 7.) Therefore, the Commission refused to set a rate and indicated that while it expected the FCC to address the issue in the near future, it had no objection to Level 3 filing an immediate petition with the FCC on the issue of the compensation rate applicable to VNXX-routed ISP-bound traffic. (Compl. Ex. 1 at 8.)

Level 3 did not file a petition with the FCC. Rather, Level 3 filed a complaint in this court on September 1, 2010, asserting that the Commission erred in not incorporating a rate of .0007 per minute of use for dial-up ISP bound traffic in the interconnection agreement and requiring Level 3 to pay Qwest for facilities used to carry VNXX ISP-bound traffic back to Level 3's primary POI. (Compl. at 18.) Level 3, Qwest, and the Commission each move for summary judgment, and these summary judgment motions are currently before the court.

*Legal Standard*

Summary judgment is appropriate where the " movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a) (2010). Summary judgment is not proper if material factual issues exist for trial. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts

which show a genuine issue for trial. *Id.* at 324. A nonmoving party cannot defeat summary judgment by relying on the allegations in the complaint, or with unsupported conjecture or conclusory statements. *Hernandez v. Spacelabs Medical, Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003). Thus, summary judgment should be entered against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

The court must view the evidence in the light most favorable to the nonmoving party. *Bell v. Cameron Meadows Land Co.*, 669 F.2d 1278, 1284 (9th Cir. 1982). All reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party. *Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir. 1976). Where different ultimate inferences may be drawn, summary judgment is inappropriate. *Sankovich v. Life Ins. Co. of North America*, 638 F.2d 136, 140 (9th Cir. 1981).

However, deference to the nonmoving party has limits. A party asserting that a fact cannot be true or is genuinely disputed must support the assertion with admissible evidence. FED. R. CIV. P. 56(c) (2010). The "mere existence of a scintilla of evidence in support of the [party's] position [is] insufficient." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Therefore, where "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotations marks omitted).

*Standard of Review*

The Act vests district courts with jurisdiction to determine whether an interconnection agreement meets the requirements of the Act. 47 U.S.C. §252(e)(6)(2007). The court reviews the

Commission's interpretation and application of the Act *de novo*. *Peevey*, 462 F.3d at 1150. All other issues, including the Commission's factual findings, are reviewed under an arbitrary and capricious standard. *Id.* "A state commission's decision is arbitrary and capricious if the decision 'was not supported by substantial evidence' or the commission made a 'clear error of judgment.'" *Id.* at 1150 (quoting *Pacific Bell v. Pac-West Telecomm, Inc.*, 325 F.3d 1114, 1131 (9th Cir. 2003)).

*Discussion*

Level 3 filed this action asserting that the Commission "violated its obligation to decide arbitrated issues in accordance with governing federal telecommunications laws and policies." (Compl. ¶ 5.) Specifically, Level 3 asserts that the Commission erred in finding that VNXX-routed ISP-bound traffic is not covered by the reciprocal compensation provisions of § 251(b)(5) and that Level 3 is obligated to pay access charges to Qwest for the transport of VNXX-routed ISP-bound traffic from Level 3's secondary POI's to its primary POI. The parties disagree on whether the FCC has determined the appropriate compensation for VNXX-routed ISP-bound traffic. However, before addressing the parties' arguments on the merits of this issue, the court first must address the question of whether it has jurisdiction over the questions presented by the complaint.

I. Jurisdiction

Qwest argues that because the Commission refused to set a rate for VNXX-routed ISP-bound traffic, Level 3's sole avenue of redress is to file an action before the FCC. In support of this argument, Qwest relies on § 252(e)(5), which provides that:

> If a State commission fails to act to carry out its responsibility under this section in any proceeding or other matter under this section, then the [FCC] shall issue an order preempting the State commission's jurisdiction of that proceeding or matter within 90 days after being notified (or taking notice) of such failure, and shall assume the responsibility of the State commission under this section with respect to the

proceeding or matter and act for the State commission.

47 U.S.C. § 252(e)(5).

Qwest also relies on *Global NAPs, Inc. v. Fed. Commc'ns Comm'n*, 291 F.3d 832, 835 (D.C. Cir. 2002). There, the state commission originally failed to act for eight months on a request for a declaratory ruling that ISP-bound traffic is subject to reciprocal compensation under the terms of a specific interconnection agreement. The state commission then dismissed the request as moot after ruling on an identically worded interconnection agreement between different parties that ISP-bound calls were not local. Prior to the dismissal by the state commission, the plaintiff petitioned the FCC for preemption under § 252(e). *Id.* The FCC denied the petition because the plaintiff's request had been dismissed by the state commission, and there was nothing left for the FCC to preempt. *Id.* at 836. The FCC also refused to consider the substantive validity of the state commission's dismissal, finding that its "statutory preemption authority did not empower the federal agency to examine the 'underlying reasoning' supplied by the [state commission] for its conclusion." *Id.* The D.C. Circuit effectively affirmed the ruling by the FCC explaining that "GNAPs' remedy lies not in FCC preemptions, but rather in judicial review of [the state commission's] order, whether in federal or in state court." *Id.* at 834.

Here, the Commission did not "fail to act" but approved the interconnection agreement. Nothing remains before the Commission for the FCC to preempt. The Commission's failure to set a rate in deference to the FCC, or to an expected ruling on the appropriate rate to be charged for VNXX-routed ISP-bound traffic, is not a failure to act in light of the Commission's acknowledgment that such action is akin to the setting of a zero rate, and the parties' execution of and compliance with the remaining terms of the interconnection agreement in the interim three years. Furthermore, Level

3 seeks a review of the Commission's reasoning supporting its finding that VNXX-routed ISP-bound traffic is not subject to the reciprocal compensation provisions applicable to other ISP-bound traffic. Such a review of the Commission's underlying reasoning is properly conducted only by the courts.

The court finds that Level 3 is seeking judicial review of a final decision of the Commission and that the court has jurisdiction over the complaint under § 252(e)(6). That section provides, in pertinent part, that "[i]n any case in which a State commission makes a determination under this section, any party aggrieved by such determination may bring an action in an appropriate Federal district court to determine whether the agreement or statement meets the requirements of section 251 and this section." 47 U.S.C. 252(e)(6)(2007). This finding is consistent with the FCC's construction of § 252 in the *Implementation of the Local Competition Provisions in the Telecommunications Act of 1996, First Report and Order*, 11 FCC Rcd. 15499, 16128 (1996)("*Local Competition Order*"). The FCC took a restrictive view on what constitutes a state's failure to act and interpreted "failure to act" to mean "a state's failure to complete its duties in a timely manner", and limited Commission action to "instances where a state commission fails to respond, within a reasonable time, to a request for mediation or arbitration, or fails to complete arbitration within the time limits of section 252(b)(4)(C)."

Even if the court were to assume that the Commission's decision not to set a rate for VNXX-routed ISP-bound traffic and to defer to the FCC on this issue constitutes a failure to act, the FCC has clearly held that an appeal to the federal district court under § 252(e)(6) and a petition for preemption to the FCC under § 252(e)(5) are not mutually exclusive, but rather alternative remedies. *In the Matter of Starpower Communications, LLC Petition for Preemption of Jurisdiction of the Virginia State Corporation Commission Pursuant to Section 252(E)(5) of the Telecommunications*

*Act of 1996*, 15 FCC Rcd. 11277, 11281 (2000)("[B]y seeking relief concurrently in Federal district court and this Commission, Starpower has exercised its right to seek alternative remedies.") The fact that Level 3 has elected to pursue its remedies in this court under § 252(e)(6), rather that before the FCC under § 252(e)(5), does not divest this court of jurisdiction.

Having found that this court has jurisdiction over the matters before it, this court moves to address the merits of the claims presented.

II. Merits

A discussion of the merits of the pending motions for summary judgment requires an understanding of various FCC orders and court opinions addressing the applicability of the Act, and specifically, the reciprocal compensation provisions of § 251(b)(5), to ISP-bound traffic. Congress directed the FCC to promulgate regulations implementing the Act's provisions. 47 U.S.C. §251(d)(1)(2007). Within six months, the FCC issued the *Local Competition Order* wherein it adopted initial rules designed to accomplish the goals of the Act and attempted to identify the forms of telecommunications covered by the various provisions of the Act. *Local Competition Order*, 11 FCC Rcd. at 15505. The FCC recognized that, as a legal matter, the transport and termination of local traffic are different services than access service for long distance telecommunications and noted that these services should be handled separately. Specifically, the FCC concluded that:

> section 251 (b)(5) reciprocal compensation obligations should apply only to traffic that originates and terminates within a local area, as defined in the following paragraph. We disagree with Frontier's contention that section 251(b)(5) entitles an IXC[4] to receive reciprocal compensation from a LEC when a long-distance call is passed from the LEC serving the caller to the IXC. Access charges were developed to address a situation in which three carriers – typically, the originating LEC, the IXC, and the terminating LEC – collaborate to complete a long-distance call. As a

[4]IXC is defined as interexchange carrier. *Local Competition Order*, 11 FCC Rcd. at 15511.

> general matter, in the access charge regime, the long-distance caller pays long-distance charges to the IXC, and the IXC must pay both LECs for originating and terminating access service. By contrast, reciprocal compensation for transport and termination of calls is intended for a situation in which two carriers collaborate to complete a local call. In this case, the local caller pays charges to the originating carrier, and the originating carrier must compensate the terminating carrier for completing the call. This reading of the statue is confirmed by section 252(d)(2)(A)(i), which establishes the pricing standards for section 251(b)(5). Section 252(d)(2)(A)(i) provides for "recovery by each carrier of costs associated with the transport and termination of each carrier's network facilities of calls that originate on the network facilities of the other carrier." We note that our conclusion that long distance traffic is not subject to the transport and termination provisions of section 251 does not in any way disrupt the ability IXCs to terminate their interstate long-distance traffic on LEC networks. Pursuant to section 251(g), LECs must continue to offer tariffed interstate access services just as they did prior to enactment of the 1996 Act. We find that the reciprocal compensation provisions of section 251(b)(5) for transport and termination of traffic do not apply to the transport or termination of interstate or intrastate interexchange traffic.
>
> With the exception of traffic to or from a CMRS[5] network, state commissions have the authority to determine what geographic areas should be considered "local areas" for the purpose of applying reciprocal compensation obligations under section 251(b)(5), consistent with the state commissions' historical practice of defining local service areas for wireline LECs. Traffic originating or terminating outside of the applicable local area would be subject to interstate and intrastate access charges. We expect the states to determine whether intrastate transport and termination of traffic between competing LECs, where a portion of their local service areas are not the same, would be governed by section 251(b)(5)'s reciprocal compensation obligations or whether intrastate access charges should apply to the portions of their local service areas that are different.

*Local Competition Order,* 11 FCC Rcd. at 16013-14 (explanatory footnotes added).

With the advent and growing popularity of the internet, the FCC naturally received inquiries regarding the appropriate handling of ISP-bound traffic under the Act. As is the case in the matter currently before the court, CLECs argued that ISP-bound traffic is local traffic subject to the reciprocal compensation provisions of § 251(b)(5), while ILECs asserted that ISP-bound traffic was

---

[5]CMRS is defined as "commercial mobile radio service providers." *Local Competition Order* at 15514.

interstate traffic beyond the scope of § 251(b)(5). *See In the Matter of Implementation of the Local Competition Provisions in the Telecommunications Act of 1996 (Inter-Carrier Compensation for ISP-Bound Traffic)*, 14 FCC Rcd. 3689 (1999)("*Declaratory Ruling*").

In the *Declaratory Ruling*, the FCC described the typical arrangement for the processing of intercarrier ISP-bound calls. First, the call is carried by the originating LEC from the caller to the point of interconnection with the LEC servicing the ISP. The call is then carried by the LEC servicing the ISP from the point of interconnection to the ISP's local server. Finally, the ISP carries the call from its local server to the computer the caller desires to reach via the internet. *Declaratory Ruling*, 14 FCC Rcd. at 3694. Under this scenario, the call is local up until it reaches the ISP's local server. *Id.* (If these calls terminate at the ISPs local server, then they are intrastate calls and are subject to reciprocal compensation under the Act.) The call becomes interstate only when the ISP carries the call from the local server to the ultimate destination, specifically at an internet website that is more often than not located in another state. *Id.* at 3697.

The FCC rejected the argument that ISP-bound traffic should be separated into two components – the intrastate telecommunications service provided by one or more LECs and the interstate information service provided by the ISP – and characterized independently. Instead, the FCC found that "communications should be analyzed on an end-to-end basis, rather than by breaking the transmission into component parts." *Id.* at 3700. The FCC reasoned that ISP-bound traffic at issue was properly characterized as interstate in that the communications did not terminate at the ISPs local server but continued on to the internet website located in another state despite the fact that the LEC or LECs providing the telecommunications service were located within a single state. *Id.* at 3697.

The FCC then addressed the issue of the appropriate compensation mechanism for ISP-bound traffic. With the characterization of such traffic as "interstate," the reciprocal compensation provisions in § 251(b)(5), which apply only to local communications, did not apply to ISP-bound traffic. However, in the absence of a federal rule governing intercarrier compensation for ISP-bound traffic, the FCC deferred to the state commissions and the parties to determine whether the reciprocal compensation scheme found in § 251(g) applies to such traffic. *Id.* at 3703. The FCC stated it would not interfere with the decisions of parties to an interconnection agreement who voluntarily included ISP-bound traffic within the provisions of the Act or state commissions who determine that reciprocal compensation is appropriate for ISP-bound traffic, provided there is no other conflict with governing federal law. *Id.* at 3704-06. "By the same token, in the absence of governing federal law, state commissions also are free not to require the payment of reciprocal compensation for this traffic and to adopt another compensation method." *Id.* at 3706.

Various ILECs and CLECs petitioned the D.C. Circuit for review of the *Declaratory Ruling*. The ILECs objected to the FCC's conclusion that state commissions have the authority to impose reciprocal compensation on ISP-bound traffic despite the finding that such traffic is interstate and not subject to § 251(b)(5). *Bell Atl. Tel. Co.s v. Fed. Commc'ns Comm'n*, 206 F.3d 1, 3 (D.C. Cir. 2000). On the other hand, the CLECs asserted that the FCC erred in determining that ISP-bound traffic is not covered by § 251(b)(5). *Id.*

The court summarized the question presented to the FCC in the *Declaratory Ruling* as "whether calls to internet service providers ('ISPs') within the caller's local calling area are themselves 'local.'" *Id.* at 2. The court noted that the end-to-end analysis utilized by the FCC in determining that ISP-bound traffic was interstate in nature was traditionally used to determine

whether a communication was within the FCC's jurisdiction, but that the FCC did not provide an explanation why this analysis " is relevant to discerning whether a call to an ISP should fit within the local call model of two collaborating LECs or the long-distance model of a long-distance carrier collaborating with two LECs." *Id.* at 3, 6. In the absence of such an explanation, the court remanded the issue to the FCC for more reasoned decisionmaking. *Id.* at 3. Specifically, the court held:

> Because the Commission has not provided a satisfactory explanation why LECs that terminate calls to ISPs are not properly seen as "terminat[ing] . . . local telecommunications traffic," and why such traffic is "exchange access" rather than "telephone exchange service," we vacate the ruling and remand the case to the Commission."

*Id.* at 9.

On remand, the FCC affirmed its prior decision that ISP-bound traffic was not subject to the reciprocal compensation provisions of § 251(b)(5), but for a different reason. The FCC found "that Congress, through section 251(g), expressly limited the reach of section 251(b)(5) to exclude ISP-bound traffic." *In the Matter of Implementation of the Local Competition Provisions of the Telecommunications Act of 1996 (Intercarrier Compensation for ISP-Bound Traffic)*, 16 FCC Rcd. 9151, 9154 (2001)("*Remand Order*").

In the *Remand Order*, the FCC acknowledged that "an ISP's end-user customers typically access the Internet through an ISP server located in the same local calling area." *Id.* at 9157. It then focused on the language of the Act in determining where ISP-bound traffic falls within the provision of the Act. The FCC rejected its prior determination that, for purposes of reciprocal compensation, under § 251(b)(5), ISP-bound traffic was interstate, rather than local, in nature, in part because the term "local" is not defined in the Act and is, therefore, susceptible to varying meanings. The FCC then determined that a reasonable reading of § 251 "is that Congress intended to exclude the traffic

listed in subsection (g) from the reciprocal compensation requirements of subsection (b)(5)." *Id.* at 9166. Accordingly, services properly characterized as "exchange access, information access, and exchange services for such access to interexchange carrier and information service providers" fell within subsection (g) and were not subject to section (b)(5). 47 U.S.C. §251(g)(2007); *Remand Order*, 16 FCC Rcd. at 9167.

The FCC characterized the services identified in § 215(g) as "access services or services associated with access" governed by federal or state regulations predating the Act. *Remand Order*, 16 FCC Rcd. at 9168. LECs historically provided such "access services to IXCs and to information service providers in order to connect calls that travel to points – both interstate and intrastate – beyond the local exchange." *Id.* at 9168. The FCC found it reasonable that Congress did not want to disrupt these "pre-existing relationship[s]" and intentionally excluded "all such access traffic from the purview of section 251(b)(5)." *Id.* Accordingly, "Congress preserved the pre-Act regulatory treatment of all the access services enumerated under section 251(g)." *Id.* at 9169.

The FCC concluded that Congress intended to adopt the definition of "information access" identified in the consent decree issued in *United States v. Am. Tel. and Tel. Co.*, 552 F. Supp. 131, 229 (D.D.C. 1982), which defined "information access" as "the provision of specialized exchange telecommunication services . . . in connection with the origination, termination, transmission, switching, forwarding or routing of telecommunications traffic to or from the facilities of a provider of information services." *Remand Order* at 9171. It then found that "this definition of 'information access' was meant to include all access traffic that was routed by a LEC 'to or from' providers of information services, of which ISPs are a subset" and that "[b]ecause the legacy term 'information access' in section 251(g) encompasses ISP-bound traffic . . ., this traffic is excepted from the scope

of the 'telecommunications' subject to reciprocal compensation under section 251(b)(5)." *Id.* at 9171-72.

The FCC indicated it made a mistake in the *Declaratory Ruling* by focusing on whether traffic was local or interstate, rather than on the specific language of the Act, to determine whether such traffic was subject to reciprocal compensation under § 251(b)(5). *Id.* at 9172. Similarly, the FCC modified its conclusion in the *Local Competition Order* that only local traffic was subject to § 251(b)(5). *Id.* at 9173. "We now hold that the telecommunications subject to those provisions are all such telecommunications not excluded by section 215(g)." *Id.*

Despite finding that the ISP-bound traffic was excepted from the reciprocal compensation provisions of § 251(b)(5) by § 251(g), the FFC determined that under the savings provision found in § 251(i), which provides that "[n]othing in this section shall be construed to limit or otherwise affect the Commission's authority under section 201", it had the authority to establish rules governing intercarrier compensation for interstate access service, such as ISP-bound traffic. *Id.* at 9174-75. In doing do, the FCC relied on the end-to-end analysis previously applied in the *Declaratory Ruling*, as well as the reasoning of the Eighth Circuit in *Southwestern Bell Tel. Co. v. Fed. Commc'ns Comm'n,* 153 F.3d 523, 543 (8th Cir. 1998), to determine that ISP-bound traffic should be considered interstate in nature. *Id.* at 9175. The FCC explained that the remanding court recognized that this analysis was appropriate for jurisdictional issues. *Id.*

In setting an interim compensation regime for ISP-bound traffic, the FCC was aware of regulatory arbitrage opportunities associated with intercarrier payments. These opportunities resulted from the reciprocal compensation regime which were particularly apparent with respect to ISP-bound traffic due to the fact that ISPs generally generate large volumes of traffic that is virtually

all one-way and a number of CLECs had targeted ISPs as customers to take advantage of these one-sided payments. *Id.* at 9181. The FCC opined that "a bill and keep approach to recovering the costs of delivering ISP-bound traffic is likely to be more economically efficient than recovering these costs from originating carriers." *Id.* Under this approach, the originating ILEC would recover its costs from the customer placing the call and the CLEC would recover its costs from the ISP customer to which the call is delivered, rather than placing the bulk of the expense on the originating carrier, and consequently, the originating carrier's customer. *Id.* However, the FCC was concerned about the effect such a drastic change would have on the legitimate business expectations of carriers operating under agreements based on reciprocal compensation for ISP-bound traffic. *Id.* at 9186.

In light of these concerns, the FCC established caps for intercarrier compensation under an existing interconnection agreement, starting with a $.0015 per minute of use and decreasing to $.0007 per minute of use over a three-year period. *Id.* at 9187. These caps apply only when the ILEC agrees to exchange all § 251(b)(5) traffic at the same rate as ISP-bound traffic. Otherwise, the reciprocal compensation rate set by the state would apply to ISP-bound traffic. *Id.* at 9193. The FCC also imposed a cap on the total ISP-bound minutes for which a carrier may receive reciprocal compensation to the annualized payments received under an existing interconnection agreement plus an annual ten percent growth factor for the first two years. *Id.* at 9187. Where carriers were not exchanging traffic pursuant to an interconnection agreement prior to the effective date of the *Remand Order* (approximately June 2001), carriers were required to exchange ISP-bound traffic on a bill-and-keep basis until the FCC formally adopted a compensation regime for such traffic.[6] *Id.* at 9188.

---

[6]The FCC issued a companion Notice of Proposed Rulemaking to address the appropriate compensation regime with the *Remand Order*.

The FCC's exercise of authority to under § 201 to create a compensation scheme for ISP-bound traffic eliminated any authority the state commission previously had to address the issue. *Id.* at 9189.

Various CLECs wasted no time in petitioning the D.C. Circuit for review of the *Remand Order*, arguing that the FCC erred in determining that ISP-bound traffic fell within the services excepted from the reciprocal compensation requirements of § 251(b)(5) by § 251(g). *Worldcom, Inc. v. Fed. Commc'ns Comm'n*, 288 F.3d 429, 432 (D.C. Cir. 2002)("*Worldcom I*"). Additionally, several states filed their own petition asserting that the *Remand Order* "unlawfully preempt[ed] their authority to determine the compensation of ISP-serving LECs." *Id.* Once again, the court rejected the analysis used by the FCC to except ISP-bound traffic from § 251(b)(5). The court found that § 251(g) did not except ISP-bound traffic from § 251(b)(5) for a variety of reasons. First, the court noted that § 251(g) "is worded simply as a transitional device, preserving various LEC duties that antedated the 1996 Act until such time as the Commission should adopt new rules pursuant to the Act" and did not support the FCC's interpretation that it created an ongoing exception to § 251(b)(5). *Id.* at 430, 432-32. Second, § 251(g) continues any pre-Act obligations and the FCC did not identify "any pre-Act federally created obligation for LECs to interconnect to each other for ISP-bound calls." *Id.* at 433. Last, the court limited § 251(g) to services provided "to interexchange carriers and information service providers", which did not include "LECs' services to other LECs, even if en route to an ISP [because such services] are not 'to' either an IXC or an ISP." *Id.* at 433-34. The court did not vacate the remainder of the *Remand Order*, noting that many of the petitioners favored the bill-and-keep compensation method, but simply remanded the case for further proceedings. *Id.* at 434. Additionally, the court did not address any of the other issues posed by the parties. The court did appear to reaffirm the FCC's finding in the *Local Competition Order* that the reciprocal

compensation requirement of § 251(b)(5) is limited to local traffic. *Id.* at 430-31 ("Although [the Act's] literal language purports to extend reciprocal compensation to *all* 'telecommunications,' the Commission has construed it as limited to 'local' traffic only.")

With the rules adopted in the *Remand Order* left untouched by the court and remaining in place, Core Communications, Inc, a CLEC, ("Core") filed a petition with the FCC asking the FCC to forbear from enforcing the interim rules. *Petition of Core Communications, Inc. for Forbearance under 47 U.S.C. § 160(c) from Application of the ISP Remand Order*, 19 FCC Rcd. 20179 (2004)("*Forbearance Order*"). The FCC granted Core's petition with regard to the growth cap and the application of bill-and-keep to new markets but denied the petition with regard to the rate caps and the "mirroring rule" requiring ILECs to offer to exchange all § 251(b)(5) traffic at the rates set in the *Remand Order*. *Forbearance Order*, 19 FCC Rcd. at 20184.

Core petitioned the D.C. Circuit for review of the *Forbearance Order* arguing that the FCC should have granted its petition on all interim provisions and an ILEC filed a similar petition asserting that the FCC should have denied Core's petition in its entirety. *In Re Core Commc'ns, Inc.*, 455 F.3d 267, 270 (D.C. Cir. 2008)("*Core I*"). The court described the reciprocal compensation arrangement required under the Act as follows:

> "[w]hen a customer of carrier A makes a local call to a customer of carrier B, and carrier B uses its facilities to connect, or 'terminate,' that call to its own customer, the 'originating' carrier A is ordinarily required to compensate the 'terminating' carrier B for the use of carrier B's facilities."

*Id.* at 270 (quoting *SBC Inc. v. FCC*, 414 F.3d 486, 490 (3rd Cir. 2005). The court found the FCC's analysis and conclusions set forth in the *Forbearance Order* to be reasonable and denied both petitions, leaving the rate caps and mirroring rule in place. *Core I* at 283. The FCC subsequently

denied a second petition for forbearance filed by Core leaving the rate cap and mirroring rule in place. *In the Matter of Petition of Core Communications, Inc. for Forbearance from Section 251(g) and 254(g) of the Communications Act and Implementing Rules*, 22 FCC Rcd. 14118 (2007).

When the FCC did not promptly consider the issues remanded by the court in *Worldcom I*, Core twice petitioned the D.C. Circuit for a writ of mandamus seeking an order compelling the FCC to explain the legal basis for the compensation structure applicable to ISP-bound traffic. The court dismissed the first petition filed in 2005 with leave to refile in the event of significant additional delay. *In Re Core Commc'ns, Inc.*, 531 F.3d 849, 850 (D.C. Cir. 2008)("*Core II*"). In 2008, the court granted the second petition finding that the FCC's failure to address the issues remanded for over six years was egregious. *Id.* The court directed the FCC to "explain the legal basis for its ISP-bound compensation rules within six months. . . ." *Id.* The court characterized the calls at issue in the *Remand Order* as "dial-up" calls and explained that:

> [U]nder the dial-up method, a consumer uses a line provided by a local exchange carrier (LEC) – usually an incumbent local exchange carrier (ILEC) – to dial the local telephone number of an Internet service provider (ISP), which then connects the call to the Internet. Typically, the ISP does not subscribe to the ILEC, but instead subscribes to another LEC – a competitive local exchange carrier (CLEC) – that interconnects with the incumbent. Accordingly, a customer who dials up to the Internet usually obligates and originating ILEC to transfer the call to a CLEC, which then delivers the call to the ISP.

*Id.* at 850-51.

On remand, the FCC confirmed its authority to impose rules on ISP-bound traffic under §§ 201 and 251(i). *In the Matter of Intercarrier Compensation for ISP-Bound Traffic*, 24 FCC Rcd. 6475, 6476 (2008)("*Mandamus Order*"). First, it concluded "that the scope of section 251(b)(5) is broad enough to encompass ISP-bound traffic" and that "section 251(b)(5) is not limited to local

traffic." *Id.* at 6479. The FCC explained that:

> The Act broadly defines "telecommunications" as the "transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received." Its scope is not limited geographically ("local," "intrastate," or "interstate") or to particular services ("telephone exchange service," "telephone toll service," or "exchange access"). We find that the [ISP-bound] traffic we elect to bring within this framework fits squarely within the meaning of "telecommunications."

*Id.* at 6479. The FCC reaffirmed its general holding that traffic encompassed by § 251(g) is excluded from § 251(b)(5) but acknowledged that the D.C. Circuit had clearly held that ISP-bound traffic did not fall within the parameters of § 251(g). *Id.* at 6483. "As a result, we find that ISP-bound traffic clearly falls within the scope of section 251(b)(5)." *Id.*

Having found that the communications at issue were subject to § 251(b)(5), the FCC then determined that because the communications were clearly interstate in nature, § 251(i) placed such communications under the FCC's authority under § 201.

> In sections 251 and 252 of the Act, Congress altered the traditional regulatory framework based on jurisdiction by expanding the applicability of national rules to historically intrastate issues and state rules to historically interstate issues. In the *Local Competition First Report and Order*, the Commission found that the 1996 Act created parallel jurisdiction for the Commission and the states over interstate and intrastate matters under section 251 and 252. The Commission and the states "are to address the same matters through their parallel jurisdiction over both interstate and intrastate matters under sections 251 and 252. Moreover, section 251(I) provides that "[n]othing in this section shall be construed to limit or otherwise affect the Commission's authority under section 201. In the *Local Competition First Report and Order*, the Commission concluded that section 251(i) "affirms that the Commission's preexisting authority under section 201 continues to apply for purely interstate activities."

*Id.* at 6483-84 (footnotes omitted.) The court then reasoned that "[b]ecause we re-affirm our findings concerning the interstate nature of ISP-bound traffic, which have not been vacated by any court, it follows that such traffic falls under the Commission's section 201 authority preserved by

the Act and that we therefore have the authority to issue pricing rules pursuant to that section." *Id.* at 6484-85. "In sum, the Commission plainly has authority to establish pricing rules for interstate traffic, including ISP-bound traffic, under section 201(b), and that authority was preserved by section 251(i)." *Id.* at 6486. Under this authority, the FCC kept the rate caps and mirroring rule in place pending the opportunity to adopt a more comprehensive intercarrier compensation reform. *Id.* at 6489.

Level 3 asserts that the analysis set forth in these FCC orders and court opinions, especially that found in the *Mandamus Order*, clearly applies to all ISP-bound traffic, including the VNXX-routed ISP-bound traffic at issue here. Level 3 notes that the FCC recognized in the *Mandamus Order* that the language of § 251(b)(5) covers all telecommunications, and that the FCC explicitly ruled that § 251(b)(5) covers ISP-bound traffic. Level 3 then argues that because the FCC did not specifically except, or suggest in its analysis any possible basis to except, VNXX-routed ISP-bound traffic from the reciprocal compensation provisions of § 251(b)(5), in the *Mandamus Order*, such traffic is subject to the rate cap and mirroring rule identified in the *Remand Order* and continued in the *Mandamus Order*. Qwest argues that the Commission properly found that the *Remand Order*, which was in effect at the time the Order was issued, did not impose reciprocal compensation on VNXX-routed ISP-bound traffic, and that the *Mandamus Order* does nothing to alter this. The Commission joins in Qwest's arguments.[7]

It is clear, and Level 3 appears to concede, that at the time the Order was entered, the FCC

---

[7]The Commission also contends that it was within its authority to prohibit VNXX traffic in the state of Oregon and, therefore, had clear authority to condition Level 3's provision of VNXX service as set forth in the Order. Level 3 does not dispute this authority. Accordingly, this issue is not currently before, and need not be addressed, by this court.

orders addressing the application of the reciprocal compensation provisions of § 251(b)(5) to ISP-bound traffic were not applicable to VNXX-routed ISP-bound traffic. This is supported both by the language of the various FCC orders and case law construing such orders in existence at that time, and also by a number of cases specifically finding that the FCC orders did not apply to VNXX-routed ISP-bound traffic.

In the *Local Competition Order*, the FCC clearly distinguished between local and interexchange, or long distance, communications and found that the "reciprocal compensation provisions of section 251(b)(5) for transport and termination of traffic do not apply to the transport or termination of interstate or intrastate interexchange traffic." *Local Competition Order, 11 FCC Rcd.* at 16013. The FCC left to the states the responsibility for determining "whether intrastate transport and termination of traffic, between competing LECs, where a portion of their local service areas are not the same, would be governed by section 251(b)(5)'s reciprocal compensation obligations or whether intrastate access charges should apply to the portions of their local service areas that are different." *Id.* at 16013-14. From the outset, the FCC differentiated between local calls between two LECs and calls between two LECs traveling outside of the local service areas covered by the LECs and gave the states the authority to continue access charges for the latter.

When the FCC first addressed the issue of ISP-bound traffic, it made clear the traffic it was considering was local calls between two LECs with a subsequent transport to the internet website. *Declaratory Ruling*, 14 FCC Rcd. at 3691. (Under one typical arrangement, an ISP customer dials a seven-digit number to reach the ISP server in the same local calling area.) The court reviewing the *Declaratory Ruling* summarized the question at issue as "whether calls to internet service providers ('ISPs') within the caller's local calling area are themselves 'local'." *Bell Atl.*, 206 F.3d at 2. On

remand, the FCC again acknowledged that "an ISP's end-user customers typically access the Internet through an ISP server located in the same local calling area." *Remand Order*, 16 FCC Rcd. at 9157. One court reviewing the interim compensation regime of the *Remand Order* described the reciprocal compensation arrangement set forth in § 251(b)(5) as applying "[w]hen a customer of carrier A makes a local call to a customer of carrier B . . . ." *Core I*, 455 F.3d at 270. Similarly, the court in *Core II* described the dial-up calls at issue as being placed by a customer of an ILEC to dial "the local telephone number of an Internet service provider. . . ." *Core II*, 531 F.3d at 850.

In each of these orders, the FCC was clearly considering the type of compensation applicable to ISP-bound traffic originating with a local call between two LECs in the same calling area. There is no indication that the FCC was addressing issues relevant to VNXX-routed ISP-bound traffic or that the rulings in the orders was applicable to such traffic. Accordingly, it is not reasonable to find that the FCC's rulings to this point govern the VNXX-routed ISP-bound traffic currently at issue. This conclusion is supported by a number of court cases addressing the applicability of reciprocal compensation and the FCC's construction of the Act and its application to VNXX-routed ISP-bound traffic.

In *Global NAPS I*, the First Circuit recognized that the interim compensation regime set in the *Remand Order* preempted state regulation of intercarrier compensation for local ISP-bound calls and then addressed the question of whether the preemption extends to interexchange VNXX ISP-bound traffic. *Global NAPS I*, 444 F.3d at 65. The court relied on the requirement that an agency make their intentions clear if they intend to preempt state regulation in a specific area, and found that because the *Remand Order* was, at best, ambiguous on whether it applied to interexchange VNXX ISP-bound traffic, it was insufficient to preempt state regulation in this area. *Id.* at 71-2. The court

rejected the argument that because the FCC did not expressly limit itself to ISP-bound traffic originating and terminating within a local calling area, the *Remand Order* should apply to all ISP-bound traffic. *Id.* at 72.

> The FCC has consistently maintained a distinction between local and "interexchange" calling and the intercarrier compensation regimes that apply to them, and reaffirmed that states have authority over intrastate access charge regimes. Against the FCC's policy of recognizing such a distinction, a clearer showing is required that the FCC preempted state regulation of both access charges and reciprocal compensation for ISP-bound traffic.
>
> Indeed, in the *Remand Order* itself, the FCC reaffirmed the distinction between reciprocal compensation and access charges. It noted that Congress, in passing the [Act], did not intend to disrupt the pre-[Act] access charge regime, under which "LECs provided access services . . . in order to connect calls that travel to points – both interstate and intrastate – beyond the local exchange. In turn, both the Commission and the states had in place access regimes applicable to this traffic, which they have continued to modify over time."
>
> Furthermore, the context in which the *Remand Order* was issued casts doubts on Global NAPs' contention. The Supreme Court has held that in interpreting its own prior cases "[i]t is a maxim not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used." Such a rule also properly applies to interpretations of agency orders, especially where the order itself details the background against with it was passed.
>
> The issue that necessitated FCC action in the [*Declaratory Ruling*] and the *Remand Order* was "whether reciprocal compensation obligations apply to the delivery of calls from one LEC's end-use customer to an ISP in the came local calling area that is served by a competing LEC. The order expressly holds at a number of points that ISP-bound traffic is not subject to reciprocal compensation under § 251(b)(5). There is no express statement that ISP-bound traffic is not subject to access charges.

*Id.* at 73-4 (citations omitted). In a brief filed by the FCC at the court's request, the FCC noted that the *Remand Order* does not provide a clear answer to the question presented and could be read to address all calls placed to ISPs, but acknowledged that the administrative history indicates that the FCC was focused on "calls between dial-up users and ISPs in a single calling area." *Id.* at 74. The

FCC admitted that it "has not addressed application of the *Remand Order* to ISP-bound calls outside a local calling area" or "decided the implications of using VNXX numbers for intercarrier compensation generally." *Id.*

In another case initiated by Global NAPs, Inc., the Second Circuit addressed the ability of a state to require access charges on local, interexchange traffic and to prohibit use of VNXX arrangements. *Global NAPS Inc. v. Verizon New England, Inc.*, 454 F.3d 91 (2nd Cir. 2006)("*Global NAPs II*"). The Second Circuit noted that "[t]he FCC has in recent years considered the question whether Internet telecommunications traffic is subject to reciprocal compensation but has never directly addressed the issue of ISP-bound calls that cross local-exchange areas." *Id.* at 95. The court, relying, at least in part, on the ultimate conclusion of the FCC in the *Remand Order* "that ISP-bound traffic *within a single calling area* is not subject to reciprocal compensation," found that the FCC had not stripped state commissions of their authority to define local calling areas with respect to intercarrier compensation. *Id.* at 99. The court did not decide whether state commissions had the authority to impose access fees on ISP-bound traffic. *Id.* With regard to VNXX arrangements, the court distinguished VNXX technology from calls subject to reciprocal compensation based on the extension of VNXX calls into different local calling areas, noted that the FCC had recently noted the lack of clear precedents and rules governing the proper application of reciprocal compensation to VNXX traffic, and held that the states retained the ability to prohibit LECs from using VNXX arrangements within the state. *Id.* at 100-01.

In *Peevey*, the California Public Utility Commission ("CPUC") addressed the appropriate means for compensation between ILECs and CLECs for delivery of calls to ISPs through both local and virtual local traffic. *Peevey*, 462 F3d at 1145. The CPUC, which traditionally identifies calls

as "local" based on the numbers assigned to the calling and called parties, not the routing of the call or the geographical locations of the parties to the call, characterized all intrastate ISP-bound traffic as local. *Id.* at 1149-50. The CPUC determined that such traffic fell within the rate cap set forth in the *Remand Order* for all ISP-bound traffic but that the rate cap could not be applied retroactively to the existing interconnection agreement. *Id.* at 1150. However, the CPUC distinguished between local calls and virtual local calls and allowed the ILEC to collect call origination charges from the CLEC to compensate for the transport of VNXX calls over long distances. *Id.* The Ninth Circuit upheld the CPUC's determination that VNXX traffic was interexchange traffic and recognized the state commission's authority to regulate VNXX ISP-bound traffic.

> [T]he FCC's imposition of rate caps on ISP-bound traffic, and simultaneous preemption of state authority to address compensation for ISP-bound traffic, are not relevant. Those rate caps are intended to substitute for the reciprocal compensation that would otherwise be due to CLECs for terminating local ISP-bound traffic. They do not affect the collection of charges by ILECs for originating interexchange ISP-bound traffic. As this issue was not before the FCC when it crafted the ISP Remand Order, the order does not preclude the CPUC's ruling.

*Peevey*, 462 F.3d at 1158-59.

Our neighboring district court also found that, as of 2007, ISP-bound VNXX traffic was not subject to reciprocal compensation under rules under the Act. *Qwest Corp. v Washington State Utilities and Transp. Comm'n*, 484 F. Supp. 2d 1160 (W.D. Wa. 2007). The court found that the *Remand Order* did not "eliminate the distinction between 'local' and 'interexchange traffic' traffic and the compensation regimes that apply to each – namely, reciprocal compensation and access charges" and that the scope of the *Remand Order* is limited to ISP-bound traffic within a single local calling area. *Id.* at 1170, 1172. In a case even closer to home, Judge Aiken of this court clearly held that reciprocal compensation does not apply to VNXX traffic. *Qwest Corp. v. Universal Telecom,*

*Inc.*, No. Civ. 04-6047-AA, 2004 WL 2958421, at *10 (D. Or. Dec. 15, 2004)("VNXX traffic, whether ISP bound or not, is not subject to reciprocal compensation.")

Having concluded that the law in existence prior to the issuance of the *Mandamus Order* clearly establishes that VNXX-routed ISP-bound traffic was not subject to reciprocal compensation under the Act, the court will now address what effect, if any, the *Mandamus Order* has on this conclusion. Level 3 argues that the FCC's use of broad terms, such as "interstate, interexchange" ISP-bound traffic, in the Mandamus Order clearly includes VNXX traffic, and that the FCC extended the scope of the reciprocal compensation requirement by recognizing that it is "not limited by type of traffic, by type of carrier with which the traffic is exchanged, or by considerations of geography." (Level 3's Reply Mem. at 30.) Level 3 also contends that the FCC's rejection of the argument that § 251(b)(5) should apply to only "local" traffic is a clear indication that the FCC was rejecting the distinction between VNXX ISP-bound traffic, which is not local, from other ISP-bound traffic, which is local.

The FCC acknowledged in the *Mandamus Order* that it was responding to the writ of mandamus issued in *Core II*, which directed it only to explain the basis for its ISP-bound compensation rules which, at that time, were clearly limited to ISP-bound calls originating from a call within a local calling area. *Mandamus Order*, 24 FCC Rcd. at 6476. The FCC concluded in the *Mandamus Order* only that it had the authority to impose traffic rules for these ISP-bound calls. *Id.* Nowhere in the Mandamus Order did the FCC indicate that it was expanding the reciprocal compensation rules to other types of traffic. In fact, the FCC held only that the definition of telecommunications used in the Act was broad enough to encompass the ISP-bound traffic they had elected to bring within the coverage of § 251(b)(5). *Id.* at 6479. The fact that FCC found that §

251(b)(5) is not limited to local traffic does nothing to extend the coverage of the *Mandamus Order,* as the FCC clearly rejected its prior ruling in the *Remand Order* that only local traffic was covered under the Act, and held that all telecommunications, other than those excluded by § 251(g), were covered by the Act. The *Mandamus Order* did nothing more than affirm the FCC's conclusion in the *Remand Order*.

In light of the history behind the *Mandamus Order*, the narrow view of the ISP-bound traffic considered in, and covered by, the previous FCC orders, by both the FCC and the courts, and the absence of any expression of intent by the FCC to expand the coverage of the *Mandamus Order* to include VNXX-route, ISP-bound traffic, the court finds that the *Mandamus Order* does not impose reciprocal compensation requirements on VNXX-routed, ISP-bound traffic. Decisions from the First, Ninth, and D.C. Circuits support this conclusion.

The D.C. Circuit reviewed, and affirmed, the FCC's rate cap system for ISP-bound traffic set forth in the *Mandamus Order* in *Core Commc'ns, Inc. v. Fed. Commc'ns Comm'n,* 592 F.3d 139 (D.C. Cir. 2010). The court described dial-up internet traffic as "special because it involves interstate communications that are delivered through local calls; it thus simultaneously implicates the regimes of both § 201 and §§ 251-252." *Id.* at 144. Clearly, the court limited the application of the rate cap system, and the Mandamus Order, to ISP connections obtained through local calls.

The First Circuit again addressed a complaint filed by Global NAPs, Inc., seeking review of a interconnection agreement requiring it to pay long distance access charges whenever ISP traffic was routed outside the caller's local areas, regardless of the number being called. *Global NAPs, Inc. v. Verizon New England Inc.*, 603 F.3d 71 (1st Cir. 2010)("*Global NAPs III*"). The court rejected Global NAPs' argument that the *Mandamus Order* made it clear that the *Remand Order* preempted

the state commission's authority to regulate the traffic finding that the *Mandamus Order* "is not materially different from the [*Remand Order*] on the issues of concern to us, and our holding in [*Global NAPs I*] applies to this case as well." *Id.* at 81. The court indicated that it ruled in *Global NAPs I* that "the [Remand Order] did not govern interexchange VNXX traffic" *Id.* at 79. The court explained that the *Mandamus Order* "simply clarified" the legal support for the FCC's authority to regulate local ISP traffic and prevent regulatory arbitrage and that the issues addressed in the Mandamus Order "did not go regulation of intercarrier compensation." *Id.* at 82. "Here, the FCC has not exercised jurisdiction over interexchange traffic. Our conclusion that the FCC preempted only state regulation of *local* ISP traffic remains unaffected." *Id.* at 83. In reaching this conclusion, the court addressed, and rejected, arguments currently asserted by Level 3 – that the FCC's determination that § 251(b)(5) is not limited to local traffic and its use of the terms "interstate" and "interexchange" in describing ISP-bound traffic expand coverage of the Mandamus Order to include VNXX-routed ISP-bound traffic. *Id.* at 82-83.

Finally, the Ninth Circuit has recognized that the FCC "has *not* exercised its jurisdiction over *all* manifestations of ISP-bound traffic" in the *Remand Order* and related pronouncements, including the *Mandamus Order*. *AT&T Commc'ns of Cal., Inc. v. Pac-West Telecomm, Inc.*, 651 F.3d 980, 991 (9th Cir. 2011)(citing, among others, *Global NAPs III*, 603 F.3d at 81-82). In fact, the court characterized this limitation of the FCC's orders relating to the treatment of ISP-bound traffic under the Act "well-settled." *Id.*

The VNXX-routed ISP-bound traffic at issue here is not covered by the Remand Order or the Mandamus Order, and is not subject to the reciprocal compensation provisions of § 251(b)(5) or the compensation regime established by the FCC for local, non-VNXX ISP-bound traffic. The

Commission's handling of VNXX-routed ISP-bound traffic in the Order was well considered, in accordance with the Act and federal law, and within its authority. The Order should be affirmed and the parties should be compensated according to its terms.[8]

*Conclusion*

Qwest's motion (#30) and the Commission's motion (#29) should be GRANTED. Level 3's motion (#26) should be DENIED and the complaint dismissed with prejudice.

Scheduling Order

The Findings and Recommendation will be referred to a district judge for review. Objections, if any, are due **November 10, 2011**. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED this 26th day of October, 2011.

JOHN V. ACOSTA
United States Magistrate Judge

[8] Qwest's alternative arguments in the event the court found that the *Mandamus Order* requires reciprocal compensation for VNXX-routed ISP-bound traffic – that the *Mandamus Order* should not be applied retroactively or that VNXX-routed ISP-bound traffic is within § 251(g) and therefore, excepted from § 251(b)(5) – are moot and will not be addressed by the court.